**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN HUDZENKO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 13 C 0279 |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | Magistrate Judge Finnegan |
| Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff John Hudzenko, Jr., seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. 42 U.S.C. §§ 416, 423(d). The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and Plaintiff has now moved for summary judgment. After careful review of the record, the Court grants Plaintiff's motion and remands the case for further proceedings.

## PROCEDURAL HISTORY

Plaintiff filed his application for DIB on March 29, 2010 (with a protective filing date of December 24, 2009), alleging that he became disabled on November 29, 2009. (R. 163; 184). His date last insured was December 31, 2013. (R. 184). His stated medical conditions included bipolar disorder and back pain. (R. 188). The Social Security Administration ("SSA") denied the applications initially on July 2, 2010, and again on reconsideration on November 3, 2010. (R. 100; 102). Pursuant to Plaintiff's

---

[1] Ms. Colvin became Acting Commissioner of Social Security on February 14, 2013, and is substituted in as Defendant pursuant to Federal Rule of Civil Procedure 25(d)(1).

timely request, Administrative Law Judge ("ALJ") Daniel Dadabo held an administrative hearing on July 25, 2011. (R. 44). The ALJ heard testimony from: Plaintiff, who appeared with counsel; Plaintiff's witness, Mr. Michael Freiberg, a case manager from the Lake County Health Department; and vocational expert ("VE") Dr. Jeffrey W. Lucas. (R. 50; 82; 87). On September 8, 2011, the ALJ found that Plaintiff has disabling limitations, but he has a substance abuse disorder that is a material contributing factor to those limitations. (R. 26-37). The ALJ further found that Plaintiff's mental and physical limitations would not be disabling if he stopped abusing substances, and therefore Plaintiff was not disabled. (*Id.*). The Appeals Council denied Plaintiff's request for review on November 16, 2012, and Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. (R. 1-5).

Plaintiff's primary argument is that the ALJ erred in determining that he would not be disabled were he not a substance abuser. Specifically, Plaintiff asserts that the ALJ erred by (1) not explaining how the evidence shows that Plaintiff's mental residual functional capacity ("RFC") would improve if he did not use drugs or alcohol; (2) improperly weighting the opinion of his treating psychiatrist Dr. Javed, as set forth in the December 9, 2010 letter, the October 22, 2010 report of DDS examiner Dr. Kenneth E. Heinrichs, and the observations of his case worker, Mr. Michael Freiberg; and (3) improperly evaluating his credibility.

## **FACTUAL BACKGROUND**

Plaintiff was born on March 1, 1967, was 44 years old, and was living with and helping to care for his disabled mother at the time of the ALJ's decision. (R. 50; 61; 100). He had worked as a pest control technician for almost 18 years until December

2005, when he could no longer perform his duties due to back pain.  (R. 48; 52-53; 188-89).  He then worked several jobs, including in retail and as a security officer, but stopped working on November 28, 2009 because he had been repeatedly let go from his jobs.  (R. 55; 60; 188-89).

## A.    Medical History

### 1.    2009

According to a report summarizing Plaintiff's medical history, he reported receiving his first psychiatric treatment in about 2001 or 2002 for feelings of depression and anxiety, and he was eventually diagnosed with bipolar disorder.  (R. 338).  The earliest treatment notes in the record are dated December 30, 2008, and indicate that Plaintiff was then receiving medication management services from a psychiatrist, Dr. Darem Reddy.  (R 336).  Some of Dr. Reddy's notes state that he had been treating Plaintiff for a few years by December 2008, and was aware Plaintiff had a substance abuse problem.  (R. 344, 346).  Dr. Reddy's notes from early to mid-2009 indicate that the psychiatrist generally saw Plaintiff every few weeks for 15-minute visits.  (R. 332, 334, 336).  In these notes, Dr. Reddy reported that Plaintiff appeared "stable at his level of functioning," was working full-time, and was taking his medications for his bipolar disorder (Seroquel, Depakote and Lexapro).  (*Id.*).

Dr. Reddy made a full psychiatric examination of Plaintiff on October 1, 2009, and found that Plaintiff: was alert, oriented and cooperative; had relevant speech, an appropriate affect, and a relaxed and pleasant mood; was not suicidal or homicidal; and had good judgment, average intellect, intact short and long term memory, and fair insight.  (R. 344-46).  Dr. Reddy further found that Plaintiff had not been hospitalized in

the past year and was taking his medications, working full-time, and not drinking or using illegal drugs. (*Id.*). Plaintiff next saw Dr. Reddy on December 15, 2009, reporting increased anxiety and depression due to various interpersonal problems and the recent loss of his job. (R. 332). He also admitted being non-compliant with his medications. (*Id.*). Dr. Reddy sent Plaintiff to the Crisis Care Program ("CCP") of the Lake County Health Department for medication stabilization, and he was admitted to the CCP that same day. (R. 332; 386).

The next day, on December 16, 2009, Plaintiff was evaluated at the CCP by psychiatrist Dr. H. Singh. (R. 338-42). Plaintiff complained of stress, confusion, and auditory hallucinations, and again admitted to being non-complaint with his medications. (R. 338). Plaintiff also said that he had lost several jobs recently due to "messing up" and angry outbursts, including for sending an angry email to his boss. (R. 338-39). Dr. Singh found Plaintiff was not forthcoming about whether he had recently been using illegal drugs or drinking alcohol, and the psychiatrist suspected substance abuse. (R. 340). Dr. Singh also found that Plaintiff's mental status was abnormal, in that he displayed inadequate grooming; he was apprehensive and anxious; his affect was intense and inappropriate; his speech was pressured and spontaneous; his answers to questions were illogical; his insight was lacking; and his judgment was impaired. (*Id.*). On the positive side, Plaintiff was also alert and oriented, with his memory intact. (*Id.*). Dr. Singh assessed Plaintiff with bipolar disorder (potentially with psychotic features due to auditory hallucinations), and provisionally diagnosed him with substance-induced mood or psychotic disorder. (*Id.*). The psychiatrist increased Plaintiff's Seroquel dosage and "highly recommended" that he comply with his medications. (R. 342).

Plaintiff was discharged from the CCP on December 19, 2009, after his condition had improved due to medication stabilization. (R. 386-87).

### 2.    January 2010 through Mid-July 2010

On January 12, 2010, Plaintiff returned for a follow-up with Dr. Reddy, complaining of stress and anxiety, including because he was denied unemployment benefits. (R. 330). Plaintiff reported that, while he was not working, he was caring for his disabled mother and attending to the needs of his father, who was hospitalized. (*Id.*). Dr. Reddy increased Plaintiff's Lexapro dosage to combat his stress and anxiety and recommended he continue his other medications. (R. 330). Plaintiff continued to receive medication management services from Dr. Reddy, and generally reported taking his medications, with one exception. (R. 537-38). In early March 2010, Dr. Reddy noted that Plaintiff attempted to self-treat issues with lack of sleep and nightmares by taking extra Seroquel. (R. 537). The psychiatrist adjusted Plaintiff's medication dosages and reminded him to take them as prescribed, and Plaintiff later reported being compliant again. (*Id.*).

Plaintiff also sought treatments around this time from the Lake County Hospital for back pain. In a February 18, 2010 medical history form for that hospital, Plaintiff stated that he smoked marijuana joints daily. (R. 366-67). On March 29, 2010, while he continued to receive back pain treatments and medication management services, Plaintiff completed an application for DIB through the SSA. (R. 163). A couple months later, in late May 2010, Plaintiff again visited the CCP for assistance in medication stabilization. (R. 738). At this time, the CCP decided to assign Plaintiff a case manager, Mr. Michael Freiberg, to help him maintain compliance with his medications

and treatments without the need for admission to the CCP. (R. 737-41). Mr. Freiberg began meeting with Plaintiff in June 2010, and (among other services) helped him with medical benefits applications. (*Id.*).

On June 14, 2010, Plaintiff was examined by Disability Determination Services ("DDS") clinical psychologist Dr. William W. Lee, to evaluate his DIB claim. (R. 163; 391-93). In Dr. Lee's June 21, 2010 report, he noted that Plaintiff was caring for his disabled mother, including by doing household chores and taking her for appointments. (R. 392). Plaintiff stated that caring for his mother was stressful, he felt depressed and anxious, and he slept a lot. (*Id.*). He also occupied his time by using his computer. (*Id.*).

Dr. Lee observed that Plaintiff displayed good hygiene, was well-groomed, was attentive, had no abnormal motor movements, and spoke in a clear, organized, and coherent manner. (R. 391). Plaintiff was also oriented to person, place and time; his immediate memory recall was intact, and he was able to drive himself to his appointment. (R. 392). Plaintiff, however, also displayed poor eye contact, pressured speech, a depressed and anxious mood, and a flat and constricted affect. (R. 391). Dr. Lee also found that Plaintiff's delayed memory recall, concentration, computation and reasoning skills, and fund of knowledge, were poor, and his common sense and judgment were limited. (R. 392). As part of his assessment, Dr. Lee also reviewed Plaintiff's medical records, noting that he reported being "clean and sober" for several years, but that Dr. Singh had provisionally diagnosed him with substance abuse-related disorders. (R. 392-93). Dr. Lee diagnosed Plaintiff with bipolar disorder and

polysubstance abuse in remission, and opined that Plaintiff would not be able to independently manage any funds that might be awarded to him. (R. 393).

A couple of days later, on June 23, 2010, psychologist Dr. Russell Taylor completed a Psychiatric Review Technique and a Mental RFC Assessment of Plaintiff for DDS. (R. 411-27). The records Dr. Taylor reviewed in preparing the reports included treatment records from Drs. Reddy and Singh and Dr. Lee's June 21, 2010 report. (R. 423). Dr. Taylor assessed Plaintiff with a mood disorder that caused decreased energy and feelings of worthlessness, poor judgment concerning high-risk activities, and a substance addiction disorder with an "unknown remission status." (R. 414; 419). Dr. Taylor found that Plaintiff's mental conditions caused him mild limitations in his activities of daily living, moderate limitations in maintaining social functioning and concentration, persistence or pace, and one or two episodes of decompensation. (R. 421). Regarding Plaintiff's RFC, Dr. Taylor opined that Plaintiff could carry out simple tasks for a normal work period, could adapt to simple, routine changes and pressures, and could interact and communicate in a work setting with reduced social demands. (R. 427).

In support of his determinations, Dr. Taylor noted that Plaintiff had been admitted to CCP for medication stabilizations and that Dr. Singh had found he was anxious, but also alert with an intact memory. (R. 423). And although Dr. Reddy later found Plaintiff was under stress and anxious, he was also able to care for his parents at the time. (*Id.*). Dr. Taylor acknowledged that during Dr. Lee's examination, Plaintiff appeared anxious and showed some memory problems, computation issues and other deficits. (*Id.*). But Dr. Lee also found Plaintiff was cooperative, appeared clean, was oriented,

and spoke in a clear and organized manner.  (*Id.*).  Plaintiff also reported to Dr. Lee that he was caring for his mother, driving, and using a computer.  (*Id.*).  Furthermore, Dr. Taylor noted that in Plaintiff's report of activities of daily living, he stated he used the internet, prepared simple meals, did chores, drove alone, bought groceries, and paid bills.  (*Id.*).  On July 2, 2010, shortly after Dr. Taylor wrote his reports, the SSA denied Plaintiff's application for DIB.  (R. 100).

Plaintiff also met or talked with his case manager, Mr. Freiberg, on several occasions in July 2010, to "vent" his frustrations with various issues, including his denial of benefits, and discuss coping techniques.  (R. 724-31).  Plaintiff also reported to Mr. Freiberg that his mother visited a nursing facility for rehabilitation for some part of July 2010 (from the records, it is not clear how long she was at the facility).  (R. 728).

### 3.    Late July and Mid-August 2010 Hospitalizations

On July 20, 2010, Plaintiff attempted suicide by taking a handful of his Depakote and Seroquel pills and smoking marijuana.  This occurred after a fight with his girlfriend regarding his recent drug use and accusations that he was involved in some criminal activity (that Plaintiff claimed was only being perpetrated by his father).  (R. 445-47).  Mr. Freiberg attempted to check on Plaintiff at this time, but instead spoke to Plaintiff's girlfriend.  (R. 723).  She reported that Plaintiff had gone "out of control," that drugs were involved, and that she had called the police.  (*Id.*).  The police caused Plaintiff to be taken to the emergency room at the Advocate Condell Medical Center ("Advocate").  (R. 445).

At Advocate, Plaintiff was examined by the attending emergency room physician, Dr. Mohina Gupta.  (R. 445). Plaintiff admitted to Dr. Gupta that he smoked marijuana

and drank alcohol.  (*Id.*).  Dr. Gupta found Plaintiff was physically unharmed by his suicide attempt, but referred him for a psychiatric consultation with Dr. Robert Baker.  (R. 446-47).  Plaintiff told Dr. Baker that he had attempted suicide once before, six years ago.  (R. 447).  He also again admitted to "occasionally" smoking marijuana.  (*Id.*).  Dr. Baker found Plaintiff depressed, with a history of suicide attempts and a cannabis abuse disorder, and recommended he receive inpatient psychiatric stabilization.  (R. 447-48).  Plaintiff was involuntarily admitted to Advocate and remained there until July 26, 2010, at which time he was transferred to Elgin Mental Health Center ("Elgin") for the recommended psychiatric treatment.  (R. 481-83; 516).

Upon admission to Elgin, Plaintiff was examined by Dr. Syed Waliuddin, a psychiatrist.  (R. 516-25).  Plaintiff told Dr. Waliuddin that he had been functioning well and at his usual capacity until several weeks earlier, when he experienced financial, relationship, legal and family issues.  (R. 521).  These issues included an argument with his girlfriend, sadness over a friend's death, and problems with his children, ex-wife and father.  (R. 521).  Plaintiff also admitted drinking alcohol "a few times a week," and smoking and growing marijuana (which also caused him significant stress, because he thought the police might know about the marijuana).  (R. 516; 521; 523).  Dr. Waliuddin found Plaintiff had good verbal skills, appeared to be in good physical health, was alert and oriented, and had normal speech, thought processes and motor behavior.  (R. 516-17; 524).  However, Plaintiff appeared depressed with a sad, constricted affect; exhibited some paranoia; had poor to fair judgment and a deficient delayed memory recall; and showed a high suicide potential.  (R. 517; 524).  Dr. Waliuddin assessed Plaintiff as bipolar with a Global Assessment of Functioning ("GAF") score of 20,

recommended Plaintiff engage in group and individual therapy, and told him to restart his medications.[2] (R. 525).

While at Elgin, Plaintiff was examined by a social worker, whom he told that he had significant substance abuse issues, including that he had lost a job in 2006 due to a positive drug test screening. (R. 526-32). Plaintiff remained at Elgin until August 5, 2010, at which time he was discharged by Dr. Waliuddin. (R. 518-20). Upon discharge, Dr. Waliuddin found Plaintiff had excellent compliance with his medications, good attendance at his therapy sessions, was oriented with normal motor behavior, speech, affect, and thought process, and had improved insight and judgment. (R. 518-19). She raised his GAF score to 55.[3]

On August 6, 2010, the day after being discharged from Elgin, Plaintiff met with psychiatrist Dr. Bard S. Javed, upon referral by Dr. Reddy. (R. 536). Plaintiff's case manager, Mr. Freiberg was also present. (R. 536; 716-23). Plaintiff stated that he felt anxious, but was not suicidal or having any medication side effects. (R. 536). Dr. Javed found Plaintiff was oriented, well-related, had reasonable understanding, and assigned a GAF score of 55. (*Id.*). The psychiatrist told Plaintiff to continue his medications as instructed, and further found Plaintiff's bipolar disorder appeared

---

2      GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* 34 (4th ed., Text Rev. 2000). A GAF score of 11–20 reflects behavior that indicates some danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement), occasional failures to maintain minimal personal hygiene (e.g., smears feces), or gross impairment in communication (e.g., largely incoherent or mute). *Id.*

3      A GAF of 51–60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). American Psychiatric Association, *supra* note 2, at 34.

controlled with medication. (*Id*.). Dr. Javed also found that Plaintiff's alcohol abuse was in remission, but that he was still engaged in substance abuse, as Plaintiff admitted using marijuana the day he was released from Elgin. (*Id*.). As a result, Dr. Javed told Plaintiff he needed to work with Mr. Freiberg on attending substance abuse counseling. (*Id*.).

A few days later, on August 10, 2010, Plaintiff told Mr. Freiberg he was having suicidal thoughts (including planning to lay on the train tracks to kill himself), and Mr. Freiberg took him to the Vista Medical Center West ("Vista") emergency room. (R. 714; 756). Plaintiff denied using any alcohol or illegal drugs at that time, but his urine tested positive for cannabinoids (as well as trycyclic antidepressants).[4] (R. 755; 759). Two days later, Plaintiff was transferred to the psychiatric unit at Vista, and examined by psychiatrist Dr. Art Pogre. (R. 750-51). Plaintiff told Dr. Pogre that he was "trying not to" drink alcohol or use drugs, but over the past several days his girlfriend had brought him alcohol and marijuana. (R. 750). Plaintiff also admitted that he had not been taking his prescribed medications for at least two days prior to visiting Vista. (*Id*.). Plaintiff stated that his suicidal thoughts had subsided while at Vista, he wanted to be discharged, and he planned to keep away from his girlfriend. (*Id*.).

Dr. Pogre found Plaintiff had a constricted affect, an "indifferent" mood and a current GAF score of 45.[5] (R. 751). However, the psychiatrist also found that Plaintiff: was well-groomed, cooperative, and friendly; had good eye contact, normal speech, no

---

4 Plaintiff's positive results for tricyclic antidepressants likely resulted from his use of Seroquel, according to the Nurse Spectrum Drug Handbook, available online. *See http://medical-dictionary.thefreedictionary.com/seroquel* (last visited June 19, 2014).

5 A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Supra* note 2, at 34.

abnormal motor movements; had no hallucinations, delusions, paranoid, obsessive or racing thoughts; had intact thought processes, including with goal-directed thought and the ability to think abstractly; and had intact insight and judgment. (*Id.*). Since Plaintiff was no longer suicidal or violent, Dr. Pogre approved him for discharge on August 13, 2010. (*Id.*). After his discharge from Vista, Plaintiff continued to meet with his case manager, Mr. Freiberg. (R. 704-11). They discussed coping techniques for Plaintiff's stressors, medication compliance, and his applications for various benefits programs. (*Id.*). Plaintiff reported compliance with his medications in August 2010. (*Id.*).

### 4. September 2010 through December 2010

A few weeks after his discharge from Vista, on September 3, 2010, Plaintiff had a follow-up appointment with Dr. Javed, which Mr. Freiberg also attended. (R. 605). Plaintiff reported not drinking alcohol or using marijuana for three weeks. (*Id.*). He also said he was doing well on his medications, and had been attending narcotics and alcoholics anonymous meetings. (*Id.*). Dr. Javed found Plaintiff was well-oriented and well-related, had no abnormal movements, and had good language and speech rate and rhythm. (*Id.*). He told Plaintiff to continue using his medications and return for a follow up. (*Id.*). Throughout September, Plaintiff met or talked with Mr. Freiberg on medication compliance issues, benefits issues and coping techniques for stress. (R. 691-703).

On October 8, 2010, Plaintiff had another follow-up with Dr. Javed, at which time he reported being drug-free and alcohol-free for 60 days. (R. 604). Plaintiff described taking care of his mother, stating "I am taking care of everything – it is a full time job – [t]hank God I am [n]ot working . . . I could not do this with work." (*Id.*). Plaintiff said he

was under stress because of caring for his mother and was feeling frustrated, but said he was not having any arguments with his mother, or having any other problems. (*Id.*). Plaintiff explained that he planned on contacting Catholic Charities for assistance with caring for his mother, to relieve some of his stress. (*Id.*). Upon examination, Dr. Javed found Plaintiff was: oriented; well-related; clear in sensorium; not manic/mixed or psychotic; had no suicidal or homicidal thoughts; and was "in better shape when not using drugs/alcohol."[6] (*Id.*). The psychiatrist recommended Plaintiff continue taking his medications. (*Id.*). Plaintiff reported feeling "okay" at his meetings with Mr. Freiberg in early October, and stated to the caseworker that he was compliant with his medications. (R. 687-90). But Mr. Freiberg noted at one session that there was "a question if [Plaintiff] is taking his meds appropriately" that needed to be directed to Dr. Javed. (R. 689).

A couple weeks later, on October 21, 2010, Plaintiff was examined by DDS-consultative clinical psychologist Kenneth E. Heinrichs, who prepared an October 22, 2010 report for the reconsideration of Plaintiff's DIB application. (R. 567-69). Plaintiff reported sleep problems (including nightmares), poor appetite, depression, and occasional auditory hallucinations. (R. 567). Plaintiff also said he lived with his mother and tried to do house chores, "but generally d[id] not feel like doing anything." Plaintiff further reported that he was not using illegal drugs or drinking alcohol (although Dr. Heinrichs noted he had a substance abuse history that he did not mention). (*Id.*). Dr. Heinrichs noted that Plaintiff reported driving himself unaccompanied to his

_____

6    In psychology, "sensorium" refers to "the part of the consciousness that includes the special sensory perceptive powers and their central correlation and integration in the brain. A clear sensorium conveys the presence of a reasonably accurate memory together with a correct orientation for time, place, and person. Sensorium may be clouded in certain stages of delirium." http://medical-dictionary.thefreedictionary.com/sensorium (last visited June 19, 2014).

appointment, was on time, was appropriately dressed, had good hygiene and grooming, and was polite and cooperative, despite his dysphoric mood and poor eye contact. (*Id.*).

Upon examination, Dr. Heinrichs found that Plaintiff was fully oriented and had logical and linear thoughts. (R. 568). The psychologist also found, on the other hand, that Plaintiff's short term memory was impaired, his language functioning was "variable," and his long term memory, fund of knowledge, insight and judgment were all somewhat limited. (*Id.*). Dr. Heinrichs also found that Plaintiff's calculation and abstract thinking abilities were limited, his attention and concentration were severely impaired, and his fund of information was "impoverished." (*Id.*). Dr. Heinrichs diagnosed Plaintiff with bipolar disorder that was severe with psychotic features, assigned him a GAF score of 50, and opined that he would not have the ability to manage any awarded benefits. (R. 569). The psychologist further found that Plaintiff's "severe deficits" in memory, attention and concentration would "likely interfere" with some work-related activities absent "close supervision," and that he would "likely have difficulty adapting to the changing expectations of many work environments." (*Id.*).

On October 28, 2010, a few days after Dr. Heinrichs issued his report, psychologist Dr. Kirk Boyenga prepared a psychiatric review technique and mental RFC assessment for DDS. (R. 581-94; 595-98). In preparing these reports, Dr. Boyenga reviewed: Plaintiff's records from Advocate and Elgin; Dr. Javed's treatment notes; reports by consultative examiners Drs. Heinrichs and Lee; and Plaintiff's reports regarding his activities of daily living. (R. 593). Dr. Boyenga found that Plaintiff suffered from bipolar disorder, a substance addiction disorder and an affective disorder, resulting in mild limitations in his activities of daily living, and moderate limitations in maintaining

social functioning and concentration, persistence or pace. (R. 581, 584, 589, 591). Dr. Boyenga further opined that Plaintiff was capable of performing simple, routine, repetitive tasks; required settings involving reduced interpersonal contact; and was capable of going to familiar locations. (R. 597).

In support of his assessments, Dr. Boyenga wrote that Plaintiff had brief inpatient stays as well as outpatient services for a suicide attempt and other issues, reported phobia of crowds, and suffered from an active substance addiction problem. (R. 593; 597). With Dr. Heinrichs, Plaintiff displayed sadness and anger problems and appeared to deny substance use. (R. 593). Nevertheless, Dr. Heinrichs found Plaintiff was fully oriented, had no thought disorder, was cooperative, and had fair language functioning. (*Id.*). And Plaintiff's Elgin records showed he had a normal mental status exam upon discharge, including normal thought processes and average intelligence. (*Id.*). Plaintiff also reported caring for his mother, caring for pets, doing household chores, preparing meals, shopping, using a computer, and driving. (R. 597). Although his social skills were impaired, he was able to retain friendships and get along with family. On November 3, 2010, a few days after Dr. Boyenga wrote these reports, the SSA denied Plaintiff's application for DIB benefits on reconsideration.

On December 9, 2010, Dr. Javed and Mr. Freiberg signed a "To Whom It May Concern" letter discussing Plaintiff's mental health issues. (R. 742-43). The letter stated that Plaintiff was diagnosed as bipolar with psychotic features, hospitalized twice in 2010, and made visits to CCP from 2006 through 2010. (R. 742). The letter further stated that Plaintiff struggled with his daily activities and self-management, had poor concentration, and trouble finishing tasks. (*Id.*). The letter concluded that Plaintiff was

unable to work as a result of his mental health issues, and directed the reader to contact Mr. Freiberg with any further questions or requests for information.  (R. 742-43).

A few weeks later, on December 27, 2010, Plaintiff had a follow-up with Dr. Javed.  (R. 603).  Plaintiff described stress due to the holidays and caring for his mother, some problems sleeping, and stated he recently lost some of his medications.  (*Id.*).  Plaintiff stated that when he was on his medications, he suffered no side effects and was well.  (*Id.*).  Dr. Javed found Plaintiff was dressed appropriately, and oriented and engaged, used clear language, was not manic, psychotic, overly anxious, or depressed, and had no hallucinations or abnormal movements.  (*Id.*).  Dr. Javed told Plaintiff to be careful with his medications and take them regularly.  (*Id.*).  Throughout November and December 2010, Plaintiff met and spoke with Mr. Freiberg regarding coping skills and for medication compliance assistance.  (R. 675-85).  In these notes, Mr. Freiberg indicated that Plaintiff appeared to be compliant with his medications.  (*Id.*).

**5.    2011**

On January 3, 2011, Mr. Freiberg interviewed Plaintiff and wrote a report regarding his status for the Lake County Health Department.  (R. 617-30).  Plaintiff reported depression and anxiety issues that made him "[u]nable to function at times," affected his concentration and made it difficult to follow-through with tasks.  (R. 618).  Mr. Freiberg wrote that Plaintiff was "[u]nable to work due to extreme [m]ental [h]ealth issues," including his lack of concentration, problems completing tasks, and an inability to cope with daily life stressors.  (R. 619; 626; 628).

Regarding his substance abuse issue, Plaintiff told Mr. Freiberg that it caused him to lose his jobs, including by affecting his job performance and inducing memory

loss and relationship conflicts. (R. 622). He stated that in his teens and twenties, he had used cocaine, speed, acid, and mushrooms, but had not used any of those substances in about 20 years. (R. 623). Plaintiff did report ongoing issues with alcohol and marijuana abuse. (*Id.*). He stated that when he drank, he drank a 12-pack of beers over a two-day period, and when he used marijuana, he smoked two joints a day. (*Id.*). He was not completely clear about when he was and was not abusing those substances in the past, but stated that he had not drank any alcohol since September 2010 and had not used illicit drugs in the past six months. (*Id.*). Mr. Freiberg recommended Plaintiff continue with his ongoing case management consultations and medication monitoring and training. (R. 630). Dr. Javed also signed Mr. Freiberg's report. (*Id.*).

Plaintiff saw Dr. Javed for follow-ups in January, February, April and June 2011. (R. 599-602). During these appointments, Plaintiff generally complained of problems sleeping (including nightmares) and ongoing mood and depression issues, but denied any substance abuse issues. (*Id.*). Dr. Javed consistently found that Plaintiff had no abnormal examination results, including no suicidal thoughts or hallucinations. (*Id.*). The doctor prescribed Plaintiff Trazodone for his nightmares and sleep issues (which Plaintiff reported helped his problems, although not completely). (*Id.*). Dr. Javed also changed the medications Plaintiff was using due to issues with his medical benefits, and adjusted his Trazodone dosage to attempt to optimize its treatment of his sleep and nightmare problems. (*Id.*). During this time, Plaintiff consistently denied any medication side-effects. (*Id.*).

Plaintiff also met or talked with Mr. Freiberg throughout these months, discussing medication compliance issues, his sleep problems, and stress issues regarding caring

for his mother.  (R. 631-74).  On a few occasions, Mr. Freiberg made notations that Plaintiff reported being compliant with his medications but "there is a question if he is taking his meds appropriately." (*Id.*).  Mr. Freiberg's notes also indicate that Plaintiff's mother visited a rehabilitation facility beginning sometime in mid-March.  (R. 600).  Mr. Freiberg's notes do not state when Plaintiff's mother left the facility, but Dr. Javed's notes indicate Plaintiff brought his mother home and resumed caring for her sometime in early April.  (R. 660).

Mr. Freiberg also reported "advocat[ing]" for Plaintiff at hearings dealing with medical benefits at various times in 2011, and helping Plaintiff with forms and other benefits application processes.  (R. 646; 648-51; 653).  In the most recent notes in the record, Mr. Freiberg reported meeting with Plaintiff on June 30, 2011, at which time they discussed preparing for Plaintiff's July 2011 hearing before the ALJ.  (R. 631-34).

## B.    Plaintiff's Testimony

At the hearing before the ALJ, Plaintiff testified that he was a high school graduate, and while he was in school he had special education classes for learning disabilities.  (R. 67-68).  He had worked in pest control for about 18 years, but was fired for missing too much work due to back pain.  (R. 48; 51-53).  He then had several other jobs, including jobs at Wal-Mart and Sam's Club in 2007, and as a security officer from August 2008 through November 2009.  (R. 53-59).  Although Plaintiff had achieved a promotion to management, he said he was eventually fired from the retail jobs because he could not understand his duties, concentrate, or interact well with the public.  (R. 55).  Plaintiff stated that he was fired from the security officer job for sleeping on the job,

which he said was due to side-effects from his medications. (R. 60). He stopped working on November 29, 2009. (R. 48).

Plaintiff testified that he lived with his 63-year-old, disabled mother, and that he cared for her with the help of Catholic Charities. (R. 61-62). He ran errands, did grocery shopping, and laundry. (*Id.*). The aides from Catholic Charities cleaned, made meals, helped his mother shower, and took his mother for her doctor's appointments. (*Id.*). He said that on good days he showered, did some cleaning, and took naps. (R. 62). On bad days, he could not get out of bed, did not shower, isolated himself, did not eat well, and had panic attacks. (R. 71-73). Although he had a driver's license, he stated that he had not driven for a year, because he cannot drive while heavily medicated and sleepy. (R. 65; 76). Instead, Plaintiff's girlfriend took him places, and accompanied him while he went grocery shopping to help him. (R. 74). Plaintiff stated, however, that he does not socialize outside the home because he has a fear of crowds and claustrophobia. (R. 75). Plaintiff further testified that he could not work because he slept excessively (napping several times a day), could not concentrate or focus for more than 10 minutes at a time, had trouble understanding instructions, and was learning-disabled. (R. 65-69). Regarding his substance abuse issues, he stated that he had not used drugs or drank alcohol for a year (since July or August 2010), had a brief relapse for about a month in July or August 2010, and was clean and sober prior to that relapse for five or six years. (R. 69-71).

Plaintiff also filled out Function Reports on May 3, 2010 and August 21, 2010 in connection with his application for disability benefits. In the May 3, 2010 report, Plaintiff reported caring for his mother (including by helping her walk, take her medications, and

taking her for appointments), using his computer to go on the internet, caring for household cats, grocery shopping, cooking and cleaning. (R. 222-32). He mentioned that he napped frequently due to his medications, that he needed reminders to do things from time to time, and that he had a fear of crowds. (R. 222-24). Nevertheless, he reported leaving the home regularly, driving alone, paying bills, handling money and bank accounts, and chatting online with friends without problems. (*Id.*). In the August 21, 2010 report, Plaintiff said he had problems with sleeping (including nightmares and medication-related sleepiness) stress, learning disabilities, phobias of crowds and problems with supervisors and co-workers. (R. 270-78). In contrast with his previous report, he said he sometimes requires accompaniment when shopping, driving or going out, and that he has some problems with banking and bills. (*Id.*). However, he again reported caring for his mother, caring for the household pets, doing chores, running errands, shopping, cooking, and using a computer. (*Id.*). He also reported having a girlfriend, maintaining friendships, and visiting community centers. (*Id.*).

## C.    Witness Testimony

Plaintiff's case manager, Mr. Freiberg, also testified at his hearing. (R. 82-87). Mr. Freiberg testified that he met with Plaintiff to help him deal with his daily stressors, be in compliance with his medications, and attend his doctor's appointments. (R. 83). The case manager explained that Plaintiff would sometimes forget he took his medications and would take them again, which was reported in the case manager's notes as "questions" about whether Plaintiff was complaint. (R. 84). Mr. Freiberg also said that Plaintiff showed poor grooming and did not shower on occasion. (R. 84-85). In response to questions by the ALJ, Mr. Freiberg testified that he had been doing case

management for 15 years and has a B.S. degree in psychology, but has no medical training and is not a licensed psychiatrist or therapist. (R. 85). Mr. Freiberg also said that he took his observations regarding Plaintiff's functioning to Plaintiff's psychiatrist to assist with the psychiatric treatments. (R. 87).

**D.      Vocational Expert's Testimony**

Dr. Lucas also testified at the hearing as a VE. (R. 87-98). The ALJ asked the VE to consider a person of Plaintiff's age, work background, skill set and education, with no physical impairments, but with moderate restrictions on concentration, persistence or pace, interacting with other people, and tolerating work stresses. (R. 92). The hypothetical person was further limited to routine, repetitive work that can be learned on short demonstration, no team coordination, no frequent interaction and no public contact jobs. (R. 92-93). The VE testified that such a person could not do Plaintiff's past work, but would be able to do other jobs, and as representative jobs gave examples such as "laundry worker, domestic" and "cleaner, housekeeping." (R. 93-94). The VE further testified that to maintain the jobs, the person must be able to meet performance expectations for at least 90 percent of the work day, could only take normal breaks, and could not miss more than 1 to 1-1/2 days per month of work. (R. 94-95). And, the VE testified that the jobs could not be sustained if the worker required additional training or supervision after 30 days, because they were "repetitive, unskilled jobs." (R. 95-96). Finally, the VE testified that the person could not be employed if he could not adjust to simple workplace changes, or if he made physical threats of harm to himself or others. (R. 96-97). Plaintiff's attorney had no questions for the VE. (R. 97-98).

**E.  Administrative Law Judge's Decision**

The ALJ found that Plaintiff's back pain was not a severe impairment.  (R. 29).
But, the ALJ found that Plaintiff's bipolar disorder and substance abuse are severe
impairments, and that his impairments meet the requirements of listings 12.04 and
12.09 of 20 C.F.R. Part 404, Subpart P, Appendix 1, when considering his substance
abuse.  (R. 29-30).  The ALJ further determined that if Plaintiff was not abusing
substances, his remaining limitations would not cause him to be disabled.  (R. 30-35).
Instead, the ALJ found that when he is drug-free and alcohol-free, Plaintiff has the
capacity to perform a full range of work at all exertional levels, but subject to moderate
restrictions, signifying the need for unskilled work that is routine, repetitive and learnable
on short demonstration, involving no team coordination, no frequent interaction, and no
public contact positions.  (R. 40).

In reaching this conclusion, the ALJ relied upon the opinions of Drs. Taylor and
Boyenga.  (R. 34).  The ALJ accorded minimal weight to Dr. Heinrichs' October 2010
report, finding that it was based on unreliable information from Plaintiff and was
inconsistent with the record as a whole, absent Plaintiff's substance abuse.  (R. 34-35).
The ALJ also found that the December 9, 2010 letter signed by Dr. Javed and Mr.
Freiberg accurately assessed Plaintiff as disabled when abusing substances, but the
record showed Plaintiff's condition improved when not abusing substances.  (R. 34).
The ALJ also accorded little weight to Mr. Freiberg's testimony, finding he was not an
acceptable medical source or trained medical professional, was not credible, and made
few mental status observations of Plaintiff.  (R. 35).  Furthermore, the ALJ found
Plaintiff was not persuasive or credible.  (R. 34).

Based on the stated RFC, the ALJ accepted the VE's testimony that Plaintiff cannot perform his past relevant work, but can perform the requirements of unskilled, light occupations, such as laundry worker, domestic and cleaner, housekeeping. (R. 36). The ALJ thus concluded that Plaintiff is not disabled within the meaning of the Social Security Act, and is not entitled to benefits.

## DISCUSSION

### A.    Standard of Review

Judicial review of the ALJ's decision, which constitutes the Commissioner's final decision, is authorized by Section 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). That decision will be upheld "so long as it is supported by 'substantial evidence' and the ALJ built an 'accurate and logical bridge' between the evidence and her conclusion. *Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014) (quoting *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009)). An ALJ need not mention every piece of evidence in her opinion, as long as she does not ignore an entire line of evidence that is contrary to her conclusion. *Id.* (citing *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012)). Although the Court will not reweigh the evidence or substitute its judgment for that of the ALJ, a decision that "lacks adequate discussion of the issues will be remanded." *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014); *see also id.* (the ALJ's articulated reasoning must be sufficient to allow the reviewing court to assess the validity of the agency's findings and afford a claimant meaningful judicial review).

### B.    Five-Step Inquiry

To qualify for DIB under Title II of the Social Security Act, a claimant must establish that she suffers from a "disability" as defined by the Act and regulations.

*Infusino v. Colvin,* 12 CV 3852, 2014 WL 266205, at *7 (N.D. Ill. Jan. 23, 2014); *Gravina v. Astrue*, 10-CV-6753, 2012 WL 3006470, at *3 (N.D. Ill. July 23, 2012).  A person is disabled if she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 423 (d)(1)(A), 1382c(a)(3); *Infusino,* 2014 WL 266205, at *7; *Gravina*, 2012 WL 3006470, at *3.  In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently unemployed?  (2) Is the claimant's impairment severe?  (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?  (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work?   *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Simila*, 573 F.3d at 512-13 (citing *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000)).

**C.    Analysis**

The Court now considers Plaintiff's arguments in turn, below.

**1.    RFC Determination**

Plaintiff argues that the ALJ erred in failing to explain how his mental RFC improved when he was not using drugs and alcohol.  (Doc. 24, at 13-15; Doc. 37, at 7).  A claimant's RFC is the maximum work that he can perform despite any limitations, and is a legal decision rather than a medical one.   20 C.F.R. §§ 404.1527(d)(2), 404.1545(a)(1); SSR 96-8p, 1996 WL 374184 (July 2, 1996).  "When determining the

RFC, the ALJ must consider all medically determinable impairments," including mental limitations. *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008).

However, under the Social Security Act, substance abuse cannot be a basis for obtaining social security or disability benefits. *Harlin v. Astrue*, 424 F. App'x 564, 567 (7th Cir. 2011) ("[A]n individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled.") (quoting 42 U.S.C. § 1382c(a)(3)(J)); *see also Kangail v. Barnhart*, 454 F.3d 627, 628-29 (7th Cir. 2006) (citing 42 U.S.C. § 423(d)(2)(C); *Vester v. Barnhart*, 416 F.3d 886, 888 (8th Cir. 2005)). As a result, when the ALJ finds a claimant has potentially disabling limitations but is also a substance abuser, the ALJ must determine whether the claimant would be disabled if the claimant was not a substance abuser. *See Harlin*, 424 F. App'x at 567 (citations omitted); *see also Kangail*, 454 F.3d at 628-29 (citations omitted). In making this determination, the ALJ must articulate how the evidence shows what Plaintiff's limitations and capabilities would be if he stopped abusing drugs and alcohol. *See Richardson v. Astrue*, No. 11 C 7080, 2013 WL 427125, at *9 (N.D. Ill Jan. 31, 2013) (the ALJ is always required to build a logical bridge between the evidence and his conclusions, including when articulating the RFC determination if the claimant stopped abusing substances) (citing *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009)).

When considering Plaintiff's limitations, including the effect of his substance abuse, the ALJ found that he has mild restrictions in activities of daily living, marked difficulties in maintaining social functioning and concentration, persistence or pace, and four or more episodes of decompensation, resulting in him being disabled. (R. 29-30).

When not a substance abuser, the ALJ determined Plaintiff's limitations would improve. (R. 31). Specifically, his marked difficulties in maintaining social functioning and concentration, persistence or pace would be moderate, and his episodes of decompensation would be reduced from four or more, to one or two. (*Id.*). As a result, the ALJ found Plaintiff's substance abuse disorder is a material contributing factor to his disability, and he would not be disabled if he stopped abusing substances. (R. 36-37).

As written, the ALJ's opinion does not sufficiently explain the RFC determination. The ALJ does not rely on any medical opinion that expressed that Plaintiff's substance abuse was a material contributing factor to his limitations, or that his limitations improved significantly with sobriety. Rather, the ALJ drew numerous inferences from the record to support his independent medical conclusion that Plaintiff's mental health limitations improved when he was not abusing substances. As explained further below, the basis for the ALJ's inferences is often inscrutable or appears to conflict with his other findings, such that the Court cannot determine that the RFC determination is logical or supported by substantial evidence. *See, e.g.*, *Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009) (reversing because the ALJ impermissibly "played doctor" by reaching his own independent medical conclusion based on inferences drawn from the record without sufficient evidentiary support).

### a. Evidence Relied on for the RFC Determination

Throughout the opinion, the ALJ's determinations are unclear regarding when Plaintiff was or was not abusing substances, and what evidence the ALJ relied on to support these findings. Examining the ALJ's findings in chronological order, the ALJ first found that Plaintiff was continuously employed for over 18 years as a pest control

technician and then as a security guard, until he stopped working because "substance exacerbations rendered a bi-polar disorder unmanageable."[7] (R. 34). Plaintiff stopped working in November 2009. (R. 48; 59). Thus, the ALJ's statement implies that he determined Plaintiff began abusing substances around November 2009, after a period of over 18 years during which Plaintiff was well-functioning and not abusing substances.

The ALJ failed to specify what evidence he relied on in making the finding that Plaintiff began abusing substances around November 2009. The ALJ does discuss Dr. Singh's December 2009 report stating that Plaintiff alluded to recent drug use, but only in the context of discussing Plaintiff's credibility. (R. 34). The ALJ also specifically noted that although Dr. Singh suspected drug use, the psychiatrist could not confirm the drug use because Plaintiff was vague when questioned. (*Id.*). The ALJ determined that Plaintiff's lack of candor with Dr. Singh supported finding him less credible. (*Id.*). But, the ALJ did not explain whether he relied on Dr. Singh's report to determine that Plaintiff started abusing drugs in November 2009. Nor did the ALJ explain how he could reasonably infer that Plaintiff was abusing drugs from the psychiatrist's unconfirmed suspicions or Plaintiff's vague allusions to possible drug use.

The ALJ also failed to explain the evidence he relied upon to find that Plaintiff was not abusing substances, and had a well-controlled bipolar disorder, prior to November 2009. The record contains Dr. Reddy's December 2008 through May 2009 notes calling Plaintiff "stable," and that psychiatrist's October 1, 2009 examination report

_____

7      The ALJ's statement also implies that he found Plaintiff's full-time employment was uninterrupted until he stopped working in 2009. (R. 34). Although Plaintiff was continuously employed for almost 18 years as a pest control technician until December 2005, he then held several other short-term jobs until he stopped working in November 2009. (R. 189). He experienced periods of unemployment, sometimes lasting a few months, in between these jobs. (*Id.*). The ALJ does not explain what caused these periods of unemployment, leaving a gap in his reasoning.

stating that Plaintiff had not been using drugs or alcohol and was doing well. (R. 332; 334; 336; 338; 344-46). However, the ALJ does not discuss any consideration of these findings as support for his determinations. And the record contains no medical notes or reports prior to December 2008, nor did any medical expert testify or provide a report discussing that time period, to support the ALJ's finding. The ALJ should not have made a determination that is central to the ultimate RFC conclusion without obtaining and considering relevant medical evidence. *See M.N. ex rel. Rodriguez v. Colvin*, No. 12 C 9367, 2014 WL 1612991, at *7 (N.D. Ill. Apr. 22, 2014) ("An ALJ has the duty to ensure that the record is fully and fairly developed, even when a claimant is represented by counsel.") (citing *Skinner v. Astrue*, 478 F.3d 836, 843 (7th Cir. 2007)).

The ALJ also relied on other evidence that makes it unclear whether he found Plaintiff was using substances prior to November 2009, but was also functional and able to work. For example, relying on Mr. Freiberg's January 3, 2011 report, the ALJ wrote that Plaintiff "through September 2010 was consuming a twelve-pack of alcohol every two days," but does not state when this alcohol consumption began. (R. 30). Nor does the report clarify this matter. The Commissioner argues that the ALJ meant that Plaintiff consumed a twelve-pack of alcohol every two days "from his childhood until September 2010." (Doc. 33, at 9). If this is what the ALJ meant, the ALJ did not explain how this alcohol use accords with the finding that he was not abusing substances prior to November 2009.

The ALJ also cited evidence that in February 2010, Plaintiff admitted to "daily ongoing marijuana use." (R. 34).[8] The ALJ relied on this evidence to determine that

---

[8]     The ALJ wrote "March 2010," but this is a typographical error; the record cited is Plaintiff's medical form dated February 18, 2010. (R. 366-67).

Plaintiff lied when making a June 2010 statement that he had been "clean and sober" for a couple of years. (*Id.*). But the ALJ does not state when he thought Plaintiff's "daily ongoing marijuana use" began, or how long it lasted, based on this evidence. And the ALJ cited positive findings from August 2010 examinations by Dr. Javed and Dr. Pogre as supportive of the RFC determination, but also found that Plaintiff was "actively abusing" drugs and alcohol around that time. (R. 30; 34). The ALJ does not explain how positive examination findings from a time when Plaintiff was apparently abusing substances could support finding his RFC improved when he stopped abusing substances. (*Id.*). The lack of clarity in these findings makes it impossible for the Court to determine if the ALJ's findings were logical and supported by substantial evidence.

### b. ALJ's Inferences Based on the Evidence

Plaintiff and the Commissioner agree that the ALJ found Plaintiff was sober after September 2010. (Doc. 24, at 10; Doc. 33, at 4). And the ALJ cited positive findings by Dr. Javed from examinations in October and December 2010, and April and June 2011, as supportive of finding Plaintiff's RFC improved when he was not abusing substances. (R. 33). But, as Plaintiff argues, Dr. Javed also co-signed the letter dated December 9, 2010 that stated Plaintiff had disabling limitations. (Doc. 24, at 11, 14; *see also* R. 742-43). And, as Plaintiff notes, Dr. Javed did not purport in the letter to assess Plaintiff's limitations only when abusing substances. As a result, Dr. Javed's letter undermined the RFC determination. Nevertheless, the ALJ inferred that Dr. Javed determined Plaintiff was disabled only when he abused substances. (R. 34). The ALJ failed to explain how this inference is supported by the record. Dr. Javed never stated in any notes or reports that Plaintiff's mental health limitations significantly improved as a result

of stopping substance abuse. (Doc. 24, at 11). It is true, as the ALJ noted, that Dr. Javed wrote that Plaintiff was "in better shape" when he was clean and sober. (R. 34). But neither Dr. Javed, nor any other medical source, stated that Plaintiff's concentration, focus, self-management, or other mental limitations that Dr. Javed discussed in the December 9, 2010 letter, improved with sobriety. Thus, the ALJ's inference regarding Dr. Javed's opinion is unsubstantiated by the record.

The ALJ also supported his RFC determination by stating that he relied on the opinions of the state agency psychologists, Drs. Taylor and Boyenga, to "infer [Plaintiff's] limitations" when he is not abusing substances. (R. 34). Drs. Taylor and Boyenga reviewed materials from the record as a whole and noted in their reports that Plaintiff suffered from a substance addiction disorder. (R. 419; 589). As Plaintiff points out, however, neither psychologist stated that they were putting Plaintiff's substance abuse issues aside in making their RFC assessments. The ALJ does not explain the basis for his inference that the psychologists' assessments reflected their understanding of his condition when not abusing substances. The record does not otherwise show how these opinions could support finding that Plaintiff's limitations improved with sobriety.

Finally, the ALJ cited numerous statements by Plaintiff regarding his activities of daily living to support finding that his RFC improved while he was not abusing substances. These included statements from Plaintiff's May and August 2010 activities of daily living reports that he cared for his mother and father, did household chores, shopped, visited community centers, and used a computer, among other activities. (R. 31). These also included Plaintiff's various statements to treating physicians and

examiners that he had traveled to Oklahoma about six weeks prior to December 16, 2009, had used Facebook in July 2010, and had driven himself to his examinations in June and October 2010.  (*Id*.).  Most of these statements concerned activities taking place when the ALJ appears to have determined Plaintiff may have been or was abusing drugs and/or alcohol.  This undermines the ALJ's reliance on them, particularly when the ALJ also stated that Plaintiff was not credible with regards to his substance use and "other matters relevant to his claims."  (R. 34).

Although the Court applies a deferential standard when evaluating whether the ALJ built a logical bridge between the evidence and conclusions, the ALJ failed to meet that standard here.  *See Blakes ex. rel. Wolfe v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003) (an ALJ cannot assume a connection between two disorders in the absence of record evidence establishing a causal link between the disorders) (citing *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002); *Sarchet v. Chater*, 78 F.3d 305, 307-08 (7th Cir. 1996)); *see also Richardson*, 2013 WL 427125, at *11 (the ALJ erred in failing to explain how the evidence supported his RFC findings that the claimant's mental RFC would improve if he stopped drinking and using marijuana) (citing *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007). As a result of the flawed RFC determination, this case must be remanded for further consideration.

## 2.     Opinion Evidence

Plaintiff also argues that the ALJ specifically erred in assessing three opinions in the record.  First, Plaintiff argues that the ALJ erred by inferring that Dr. Javed's opinion in the December 9, 2010 letter that he suffered from disabling limitations only applied

when he was abusing substances. (Doc. 11, at 10-12; Doc. 37, at 1-3). For the reasons discussed above, on remand, the ALJ should reassess Dr. Javed's opinion.

Second, Plaintiff argues that the ALJ erred in according minimal weight to the October 22, 2010 report of consultative examiner Dr. Heinrichs in determining Plaintiff's limitations absent substance abuse issues. (Doc. 24, at 9-10; Doc. 37, at 5-6). Although an ALJ is not required to adopt or follow a state agency consultative examiner's opinion, the regulations provide that the ALJ must consider the opinion and "explain the weight given to the opinion" in his decision. *See McKinzey v. Astrue*, 641 F.3d 884, 891 (7th Cir. 2011) (quoting S.S.R. 96-6p, 1996 WL 374180, at *1). "An examining physician's opinion can be rejected only for reasons supported by substantial evidence in the record." *Taylor v. Barnhart*, 189 F. App'x 557, 562 (7th Cir. 2006) (citing *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)). Here, the ALJ explained that he discounted Dr. Heinrichs' opinion because that psychiatrist's conclusions were more negative than other examiners' conclusions, which may have been caused by Plaintiff exaggerating his symptoms for Dr. Heinrichs. (R. 34-35). Plaintiff argues, however, that the ALJ's reasoning that malingering may have caused a contrast between Dr. Heinrichs' impressions and some of the findings from other examinations is unsupported speculation. (Doc. 24, at 9-10). He argues that the record instead reflects "natural fluctuations in intensity" of his bipolar disorder, which would result in varying examination results at different times. (Doc. 37, at 4-5). In support, Plaintiff cites examination findings made by Drs. Lee, Waliuddin and Javed that coincide with Dr. Heinrichs' conclusions. (*Id.*).

Deciding which conflicting medical evidence to credit is for the ALJ to decide. *See Young v. Barnhart*, 362 F.3d 996, 1001 (7th Cir. 2004) ("Weighing conflicting evidence from medical experts, however, is exactly what the ALJ is required to do.") (citations omitted). Here, the ALJ's analysis fails to build a logical bridge between the evidence and his decision to not credit Dr. Heinrichs' opinion. The ALJ does not specifically state which examiners' findings conflicted with Dr. Heinrichs' impressions, making it unclear what evidence the ALJ relied on. The Commissioner notes that earlier in the opinion, the ALJ discussed certain findings from Dr. Pogre's August 2010 examination, and from Dr. Javed's October 2010 and April 2011 examinations. (Doc. 33, at 6-7). Although the ALJ did not explicitly state that these were reliable examinations that contrasted with, and thus discredited, Dr. Heinrichs' opinion, the Commissioner argues that these examinations provide sufficient support of the ALJ's conclusion.[9] The ALJ's analysis concerning these examinations does not support this conclusion. Regarding Dr. Pogre's August 2010 examination, which took place when Plaintiff was hospitalized, the ALJ stated that it "bears remark" that Plaintiff was "fairly functional" at the time. (R. 30). This appears inconsistent with the ALJ's earlier statements in the opinion that Plaintiff was overwhelmed, decompensated, and was actively abusing drugs (and possibly alcohol) around the time of his July and August

---

[9] The Commissioner also argues that Dr. Heinrichs' impressions "reasonably coincided" with findings by Drs. Taylor, Boyenga, Singh and Reddy, and conflicted with Dr. Waliuddin's July 2010 examination findings. (Doc. 33, at 8). However, the ALJ did not discuss Dr. Waliuddin's examination findings in the opinion, nor whether Dr. Heinrichs' opinion coincided with any other medical assessments in the record. Since the ALJ did not employ these rationales, this Court shall disregard them. *See, e.g., Roddy v. Astrue,* 705 F.3d 631, 637 (7th Cir. 2013) ("But the Commissioner cannot defend the ALJ's decision using this rationale directly, or by invoking an overly broad conception of harmless error, because the ALJ did not employ the rationale in his opinion.") (citing *SEC v. Chenery Corp.,* 318 U.S. 80, 87–88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943)).

2010 hospitalizations. (*Id.*). Likewise, the "conflicts" between Dr. Javed's observations and Dr. Heinrichs' impressions that the Commissioner points to also do not provide substantial evidence in support of the ALJ's determination. The fact that Plaintiff reported occasional hallucinations to Dr. Heinrichs, but denied having them at the time of a single examination with Dr. Javed, is not a conflict. (Doc. 33, at 7). Plaintiff's report to Dr. Javed that he was taking care of his mother in October 2010 also does not conflict with his statement to Dr. Heinrichs a few weeks later that he was depressed and did not feel like doing chores. (*Id.*). The two statements are not mutually-exclusive.

The ALJ also wrote that Plaintiff may have been exaggerating his symptoms with Dr. Heinrichs, because the examination was done to evaluate his disability claim. (R. 34-35). Yet the ALJ found some statements Plaintiff made during his state agency examinations were reliable, such as his statements to Drs. Heinrichs and Lee that he could drive alone. (R. 30). The ALJ's reliance on that evidence appears to conflict with his finding that Plaintiff exaggerated his limitations when examined by consultative examiners. Based on the foregoing issues, on remand, the ALJ should explain with more specificity the evidence relied upon in discounting the weight of Dr. Heinrich's opinion.

Finally, the Plaintiff argues that the ALJ erred in according little weight to the observations of his case manager, Mr. Freiberg. (Doc. 24, at 12-3; Doc. 37, at 6-7). Plaintiff admits that Mr. Freiberg is not an "acceptable medical source" and thus his statements regarding Plaintiff's limitations are not entitled to "controlling weight." (Doc. 24, at 12). *See also Phillips v. Astrue,* 413 F. App'x 878, 884 (7th Cir. 2010) (only "acceptable medical sources" can be characterized as "treating sources," whose

opinions are generally entitled to controlling weight) (citations omitted). However, the ALJ is still required to determine the weight to assign the opinions of other sources, like Mr. Freiberg, according to their consistency, supportability, and other factors of which the ALJ is aware. *See Phillips*, 413 F. App'x at 884; *see also* SSR 06-03p, 2006 WL 2329939, at *4-5 (Aug. 9, 2006) (factors used to evaluate medical sources who are not acceptable medical sources or other sources who see claimants in their professional capacity are the same as those used to evaluate medical opinions from acceptable medical sources). Here, the ALJ stated that he could "assign [Mr. Freiberg's] observations only minimal weight" because the caseworker is not an acceptable medical source. (R. 33). The ALJ further stated that Mr. Freiberg's testimony was not credible because the case worker did not discuss the impact of Plaintiff's substance abuse on his functional abilities. (R. 35). The ALJ also found that Mr. Freiberg mainly records Plaintiff's subjective reports rather than making mental status observations, but added that he is not a trained professional "for this purpose" anyway. (*Id.*).

The ALJ's reasoning for discounting the weight given to Mr. Freiberg's observations is problematic. Admittedly, Mr. Freiberg is not a trained psychiatrist or other medical professional, and therefore his opinion alone "cannot establish the existence of a medically determinable impairment." *Phillips*, 413 F. App'x at 884 (internal quotation omitted). Nevertheless, the ALJ is not limited to giving Mr. Freiberg's observations "minimal weight." Instead, the SSA's own rulings provide that the weight of a non-acceptable source's observations should be determined on the facts of the particular case, and "may, under certain circumstances, properly be determined to outweigh the opinion from a medical source, including a treating source." SSR 06-3p, at

*6.  The Commissioner argues that the ALJ's determination did not err because it was valid for the ALJ to give greater weight to the observations of medical sources in the record like Dr. Javed.  (Doc. 33, at 9).  The ALJ is certainly not required to give Mr. Freiberg's observations more than minimal weight, or more weight than a treating physician's observations.  But the ALJ's language suggests he may not have understood that he could choose to give the caseworker's observations greater than minimal weight, if the record supported that determination.  Also, the ALJ's finding that Mr. Freiberg was less credible as a witness because he did not discuss Plaintiff's substance abuse during the hearing, when he was not asked about it, is unreasonable. *See Briscoe ex. rel. Taylor*, 425 F.3d at 355 (witness could not be "faulted" for failing to name someone who could corroborate her testimony, when she was not asked to do so).  As a result, on remand the ALJ should revisit the issue of how much weight to give Mr. Freiberg's observations and testimony.

### 3.    Credibility Determination

Plaintiff argues that the ALJ erred in finding him "not persuasive or credible." (Doc. 24, at 15-19; Doc. 37, at 8-10).  In assessing a claimant's credibility, an ALJ must first determine whether the symptoms are supported by medical evidence.  *See* SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007).  If not, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record."  *Arnold*, 473 F.3d at 822.

*See also* 20 C.F.R. § 404.1529; *Carradine v. Barnhart*, 360 F.3d 751, 775 (7th Cir. 2004). An ALJ's credibility determination must contain specific reasons for the credibility finding that are supported by evidence in the record, but the credibility determination will normally be reversed only if "patently wrong." *Craft*, 539 F.3d at 678; *Schreiber v. Colvin*, 519 F. App'x 951, 960 (7th Cir. 2013). Although the ALJ gave several reasons for discrediting Plaintiff's testimony, a number of them are concerning.

The ALJ first discussed that Plaintiff appeared to minimize his role in caring for his mother at the hearing, and noted that he cared for his mother "full time," did chores and shopping for her, and administered her medications. (R. 31; 33-34). The ALJ seemed to liken these activities to full-time work, and stated that Plaintiff's care for his mother also showed he could reliably adhere to a schedule. (R. 31). But the ALJ does not discuss several items in the record that show Plaintiff's activities in caring for his mother lessened over time, and that he sometimes did not care for her at all. This evidence included Plaintiff's testimony that Catholic Charities eventually took over several of his duties in caring for his mother, including cleaning, cooking, and taking her to appointments. (R. 61-62). The ALJ also made a passing reference to notations in the record that Plaintiff's mother sometimes stayed at a nursing home, but did not discuss how this affected his determination that Plaintiff cared for her as a "full-time job." (R. 33). Nor did the ALJ discuss the multiple references in the record that caring for Plaintiff's mother caused him stress. Although an ALJ may consider Plaintiff's activities of daily living in making the credibility determination, the analysis here over-emphasizes Plaintiff's "ability to struggle through the activities of daily living" as evidence that he

"can manage the requirements of a modern workplace." *Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011).

The ALJ also reasoned that because Plaintiff was inconsistent at times concerning his substance abuse issues, he may have been "less than forthright about other matters relevant to his claims." (R. 34). The Commissioner argues that an ALJ may discredit a claimant's credibility based on lies regarding substance abuse. (Doc. 33, at 11 (citing *Hill v. Astrue*, 295 F. App'x 77 (7th Cir. 2008)). Although true in certain circumstances, the Commissioner's own case law points out that when doing so, the ALJ must explain what testimony is not believed, and what, if anything, is credited, despite the claimant's lack of candor about the substance abuse. *Hill*, 295 F. App'x at 81-82. Without doing so, the Court cannot properly evaluate the logic and support for the credibility determination. *Id.* Here, the ALJ failed to explain which of Plaintiff's statements the ALJ credited, and which were disbelieved, and why, based on Plaintiff's lack of candor about his substance abuse. This leaves the Court without a sufficient basis to evaluate the ALJ's analysis. For example, the ALJ stated that Plaintiff's testimony "overlooked" that he had a record of continuous employment for over 18 years until substance abuse issues rendered his mental disorder unmanageable. (R. 34). In support of this conclusion, the ALJ cited a statement in Dr. Waliuddin's July 26, 2010 admission examination report that Plaintiff was well-functioning until several weeks before his July 2010 breakdown. (*Id.*). The ALJ's opinion suggests this was one of Dr. Waliuddin's findings, but the report merely relays Plaintiff's statement to that psychiatrist that he was functioning well and at his usual capacity until several weeks before being admitted to Elgin. (R. 521). Thus, in making this finding, the ALJ credited

a statement by Plaintiff about his functionality, made while Plaintiff was hospitalized. The ALJ does not explain why this statement should be deemed reliable despite his finding that Plaintiff is not forthright about matters related to his claim based on his lack of candor about his substance abuse.

Finally, the ALJ relied on Plaintiff's "conservative" treatment (of pills) for his bipolar disorder, setting aside his hospitalizations because they occurred before he stopped abusing substances. (R. 34). As discussed above, the ALJ failed to make clear what evidence he relied on to support these findings. The ALJ also noted that "multiple sources within the record" indicated Plaintiff sometimes overused medications or failed to take it for days at a time. (*Id.*). But the ALJ did not discuss whether this non-compliance is related to his bipolar disorder or other mental health impairments, including how he evaluated the notations in the record (after September 2010) that Plaintiff had compliance issues. "ALJs assessing claimants with bipolar disorder must consider possible alternative explanations before concluding that non-compliance with medication supports an adverse credibility inference." *Jelinek v. Astrue*, 662 F.3d 805, 814 (7th Cir. 2011) (citations omitted). The Commissioner admits that bipolar disorder and substance abuse may inhibit medication compliance, but argues that this issue and other problems with the ALJ's credibility analysis are harmless error. (Doc. 33, at 12). Because multiple aspects of the ALJ's credibility determination were flawed, the Court cannot find the errors here were merely harmless. *See Eakin v. Astrue*, 432 F. App'x 607, 613 (7th Cir. 2011) (remanding where ALJ discredited Plaintiff's testimony due to several "troubling" determinations).

### 4.    Remaining Arguments

Plaintiff raises two remaining arguments.  The first concerns whether the ALJ adequately accounted for Plaintiff's moderate limitations in concentration, persistence and pace when articulating the RFC determination, assuming the Court found the ALJ's RFC determination was reasonable.  (Doc. 24, at 15).  The second concerns whether the VE accurately testified that a person with Plaintiff's limitations could perform certain jobs according to the DOT, assuming that the Court found the ALJ's articulation of Plaintiff's limitations was reasonable.  (*Id.*, at 19).  Since both of these arguments depend on the Court upholding the ALJ's RFC determination, they need not be addressed.

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment is granted.  Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and this case is remanded to the Social Security Administration for further proceedings consistent with this opinion.

ENTER:

Dated: June 24, 2013

_Sheila Finnegan_
SHEILA FINNEGAN
United States Magistrate Judge